1
2
3
4
5
6
7
8    IN THE UNITED STATES DISTRICT COURT
9    FOR THE DISTRICT OF ARIZONA
10
11   UNITED STATES OF AMERICA,           )
                                          )
              Plaintiff,                  )    No. CR 10-463-TUC-CKJ (CRP)
                                          )
     vs.                                  )
                                          )    **REPORT AND RECOMMENDATION**
                                          )
                                          )
     HEATHER LEA GRIFFITH and             )
     EMETERIO ROGELIO TRUJILLO,           )
                                          )
              Defendants.                 )
     _____ )

Pending before the Court is Defendants' Motion to Suppress Evidence. (Docs. 26, 34). Defendants argue law enforcement lacked the requisite reasonable suspicion to initiate a stop of their vehicle and the evidence seized as a result of the stop should be suppressed. (Doc. 26, pp. 2-4). Defendants did, in their Motion, dispute the probable cause to arrest but at the evidentiary hearing, defense counsel clarified that the defense was only disputing the stop of Defendants' vehicle. (*See* Doc. 47, Transcript of 10/26/10 Evidentiary Hearing ("TR") at 15). The Government contests the motion, arguing law enforcement relied on articulable facts supporting reasonable suspicion when the officers stopped Defendants' vehicle. (Doc. 30). On October 26, 2010, the Magistrate Judge held an evidentiary hearing on the Motion. (Doc. 40). It is the Report and Recommendation of this Court that the District Judge, after her independent review, GRANT the Motion.

**Credibility of the Witnesses from the Evidentiary Hearing**

The Ninth Circuit's model jury instruction instructs jurors, as the triers of fact, to consider the following in making a determination of witness credibility:

1. The witness's opportunity and ability to see or hear or know the things testified to;
2. The witness's memory;
3. The witness's manner while testifying;
4. The witness's interest in the outcome of the case, if any;
5. The witness's bias or prejudice, if any;
6. Whether other evidence contradicted the witness's testimony;
7. The reasonableness of the witness's testimony in light of all the evidence; and
8. Any other factors that bear on believability.

FedCrim-JI9C 1.7 Credibility of Witnesses.

At the evidentiary hearing, the Government presented the testimony of Immigration and Customs Enforcement ("ICE") Officer Carol Yazzie and ICE Office r Charmaine Harris. Officer Yazzie has worked as a tactical officer for ICE for approximately four years. (TR at 6). Officer Harris has worked as a tactical officer with ICE for about ten years. (TR at 35). Prior to working for ICE, Officer Harris was a police officer with the Tohono O'odham Reservation for nine years. (TR at 36).

The Defense presented the testimony of expert witness Tim Bright. (TR at 52). Mr. Bright is an accident reconstructionist with 42 years of experience investigating accidents and working with vehicle movement. (TR at 53). Mr. Bright has owned his own company, Bright's Vehicle Dynamics, since the early eighties. (TR at 53).

Mr. Bright's experience with the movement of vehicles and accident reconstruction is extensive. His history includes over 12 years with the Tucson Police Department during which time he did in-depth investigations into the cause and prevention of accidents. (TR at 53). He also taught auto accident investigation in the field to police recruits. (TR at 53). His other experiences with the police department include working in an accident alleviation program and serving on boards of inquiry to determine who was at fault and the degree of fault in auto accidents involving police officers. (TR at 54).

After leaving the police department, Mr. Bright studied accident reconstruction at a number of institutions including highly competitive programs at Northwestern and the Institute of Safety Analysis in Rockville, Maryland. (TR at 54-55). As part of his training

1  in technical accident investigation, Mr. Bright learned about addressing the weights of
2  vehicle, the handling characteristics of vehicles, the visibility of the drivers, and the visibility
3  that witnesses may have of drivers, occupants and their actions. (TR at 55).

4  Mr. Bright has testified as an expert witness in federal court and state court throughout
5  Arizona and California on both accident reconstruction and non-collision vehicle movements.
6  (TR at 55). He has been a guest expert at the Arizona Trial Lawyers Association, the
7  University of Arizona Law School, and the Arizona Board of Trial Advocacy. (TR at 55).

8  In this case, Mr. Bright offered an expert opinion on the officers' ability to see
9  through the rear tinted window of Defendants' vehicle as well as whether Defendants'
10 vehicle would have appeared to be heavily laden. To prepare his opinion, Mr. Bright
11 reviewed all the police reports connected to this case, a copy of the photo disk taken on the
12 night of the stop, a video tape taken by another investigator and some still photographs taken
13 by another investigator. (TR at 56). Mr. Bright also went to the area of milepost 106 along
14 State Route 86 and a couple miles west of the milepost to view the lighting. (TR at 56). He
15 also inspected Defendants' vehicle and photographed it and its vehicle identification number
16 ("VIN") plate. (TR at 56). From the VIN number, Mr. Bright ordered a report on what
17 equipment the vehicle had so he could determine its weight and offer an opinion on whether
18 it was heavily laden. (TR at 57). He also inspected the tint on the rear window of the vehicle
19 and used a "tint meter" to determine how much light could filter through the tint. (TR at 57).

20 All three of the witnesses in this case testified on the witness stand in a forthright way.
21 There are, however, critical disagreements between the ICE officers and the defense's expert
22 witness as to whether the officers could see the burlap backpacks of marijuana stacked in the
23 back of Defendants' minivan considering the tint on the back window and whether the
24 vehicle would have appeared to be "heavily laden" or riding low.

25 Additionally, the ICE officers both cited a number of facts they say they considered
26 when initiating a stop of Defendants' vehicle; these facts were not contained in their reports
27 after the incident. The officers only stated in their reports that they could see the backpacks
28 of marijuana in plain view and they observed that the vehicle appeared heavily laden.

1    The officers agreed that the purpose of writing a report post-incident is to summarize
2  the important aspects of the investigation so they may later use a report to refresh their
3  recollection. An incident report also functions as a check on an officer's testimony. Critical
4  differences between a report written just after an incident and testimony given in an
5  evidentiary months after the incident causes this Court some concern. While it is reasonable
6  that not all the details of an investigation be contained in a report, factors that the officers
7  considered in deciding to stop a vehicle are critical to an investigation. The Court is
8  particularly concerned with the number of factors cited by the officers during the evidentiary
9  hearing that were not contained in either of their reports.

10    This Court critically examined the factors identified by the officers at the evidentiary
11 hearing that were not present in their reports. After analyzing those factors, the Court gives
12 many of them minimal weight. While both Officer Yazzie and Officer Harris testified that
13 they had a good recollection of the events that occurred on February 4, 2010, the purpose of
14 a police report is to contain the important details of an investigation so the officers can later
15 use that report if necessary to refresh their recollection. (TR at 33). A report also
16 corroborates an officer's testimony at a later hearing. The officers failure to put facts in their
17 report that they say supported their reasonable suspicion to stop Defendants' vehicle detracts
18 from the weight of many of those factors.

19    **Factual Findings**

20    On February 4, 2010, ICE Officers Yazzie and Harris were working a 4:00 p.m. to
21 2:00 a.m. shift patrolling the roads within the Tohono O'odham Nation including State Route
22 86. (TR at 6, 36, 7, 37). That day the officers were conducting area surveillance and
23 narcotics tracking in the area of Pisinemo, Arizona. (TR at 6, 36-37). The Pisinemo Village
24 is part of the Tohono O'odham Nation and is located approximately 35 miles from Sells,
25 Arizona. (TR at 7).

26    The officers encountered Defendants along State Route 86 at approximately 12:30
27 a.m. (TR at 10). As described by Officer Yazzie, State Route 86 is a two-lane highway that
28 runs east and west. (TR at 7). The speed limit on the road is 65 miles per hour. (TR at 6).

1  The road has no lighting, only light from the traffic that travels along it. (TR at 7-8). Officer
2  Yazzie described the conditions that evening as "dark, very little starlight." (TR at 10).
3  There is no formal shoulder along the road; instead, a white line marks the driving lane and
4  then approximately a foot of asphalt extends beyond that line. (TR at 7).

5  As a tactical officer with ICE for the past four years, Officer Yazzie has come to know
6  State Route 86 as a common smuggling route for narcotics and aliens. (TR at 8). She has
7  tracked several backpacking groups along that highway, particularly for her, between
8  milepost 100 and 108. (TR at 8-9).

9  On the morning of the stop, the officers were traveling in an unmarked Dodge pickup
10 truck. (TR at 9, 37). Officer Harris was driving. (TR at 10, 37). She testified that State
11 Route 86 was "busy with traffic, east and west traffic." (TR at 10).

12 The officers drove up behind Defendants' vehicle as both vehicles were traveling
13 eastbound. (TR at 10). Officer Harris testified that she and Officer Yazzie were on their way
14 back to their office. (TR at 38). During the evidentiary hearing, both officers testified that
15 Defendants' vehicle was traveling at a slow rate of speed. Officer Yazzie testified that
16 Defendants were traveling in a red Dodge Caravan at approximately 50 to 55 miles per hour.
17 (TR at 10). Officer Harris did not initially mention the speed of Defendants' vehicle but
18 rather stated she drove up behind Defendants' vehicle and did not pass it right way because
19 she was waiting for a break in the westbound traffic. (TR at 38). Later Officer Harris stated
20 that they drove up on Defendants' vehicle because it was driving at a slower rate of speed
21 that 65 miles per hour. (TR at 39).

22 Both officers agreed on cross-examination that in their reports of the incident they did
23 not mention anything about Defendants' vehicle traveling at a slow rate of speed. (TR at 16-
24 17, 44). Officer Harris also agreed on cross-examination that when she provided the
25 testimony for the case to the grand jury she did not say anything about Defendants' vehicle
26 traveling slower than 65 miles per hour or driving slowly at all. (TR at 44).

27 The Court is not convinced that Defendants' vehicle was traveling at so slow a speed
28 as to be suspicious to the officers. Both officers wrote reports connected to this incident and

1    neither officer thought the speed of Defendants' vehicle was significant enough to include
2    in a report. Further, Officer Harris did not include this factor in her grand jury testimony.
3    It is believable that Defendants were traveling at a slower rate of speed than the officers
4    intended to travel on their way back to their office toward the end of their shift. It is also
5    believable that the officers traveled behind Defendants' vehicle for some amount of time as
6    they waited for a break in the heavy traffic traveling westbound. Further, it is believable that
7    Defendants' vehicle may have been traveling slower than 65 mph on a two-lane highway
8    with no lighting and heavy traffic. The Court does not give much weight to the officers'
9    testimony that the speed of Defendants' vehicle was suspicious to them.

10   Both officers testified that they encountered Defendants' vehicle around milepost 102.
11   (TR at 10, 38). Again, this is a fact that neither officer included in her report on the incident.
12   (TR at 16). This fact, however, is not critical to a determination of reasonable suspicion. It
13   seems possible that while the officers did not include this fact in their report, as it was not
14   critical to their stop of the vehicle, they may have followed Defendants' vehicle for four
15   miles. The officers testified that they drove up on Defendants' vehicle, waited for a break
16   in traffic, looked into the back of Defendants' vehicle and then initiated a stop of the vehicle.
17   It is possible those actions occurred across a four mile span and the parties agree that the stop
18   occurred around milepost 106. No testimony was presented to suggest the distance that the
19   officers followed Defendants' vehicle between the initial encounter and the stop was
20   suspicious.

21   As the officers approached Defendants' vehicle, they both testified that they saw what
22   appeared to them to be square backpacks of marijuana. At the evidentiary hearing, the
23   officers testified in great detail about how the backpacks looked. Exactly what the officers
24   could see was significantly contested by the defense and the defense's expert. Critical to the
25   defense was the lack of detail in the officers' initial reports and Officer Harris's grand jury
26   testimony. Also critical was the amount of light available for the officers looking into
27   Defendants' rear window and the affect of the dark tint on that window.

28   Officer Yazzie testified that she observed "the back window to – to have square

1  objects pressed up against the back of the window." (TR at 10). She asked Officer Harris
2  to move closer to Defendants' vehicle and at that time Officer Yazzie testified that she
3  observed "what I recognized to be at that time brown burlap pressed up against the window
4  and in the shape of a large square, two side by side." (TR at 11). Officer Yazzie testified
5  that even though it was dark out that night, she observed the bundles because the headlights
6  from vehicles traveling in the heavy westbound traffic illuminated the interior of Defendants'
7  vehicle. (TR at 11).

8  Officer Yazzie also testified that as they moved closer to Defendants' vehicle, she
9  asked Officer Harris to shine her brights on the back window. (TR at 11, 33, 38). She
10 testified that the headlights from her vehicle gave her a better view of what was in the back
11 of Defendants' vehicle. (TR at 32). Officer Yazzie testified that with the brights on, she
12 "recognized what appeared to be marijuana backpacks stacked against the rear window."
13 (TR at 11). She later described the bundles as "pressed up against the back window on two
14 square objects approximately two feet across." (TR at 12). Officer Yazzie testified she "saw
15 the imprint of the burlap, which was small brown squares, pressed up against the back
16 window." (TR at 12-13).

17 Officer Yazzie agreed on cross-examination that she did not put into her report that
18 she viewed two square objects approximately two feet across; rather she said only that she
19 observed large burlap backpacks stacked against the rear window of the van. (TR at 18).
20 She also agreed that she did not put in her report that she could see the imprint of the burlap
21 backpack up against the rear window of Defendants' vehicle. (TR at 30). She stated the
22 bundles were uncovered, in plain view, and covering the entire rear window except for
23 approximately six inches along the top of the window. (TR at 13). Officer Yazzie agreed
24 on cross-examination that she did not put anything in her report about asking Officer Harris
25 to turn on the brights and viewing the bundles with the brights on. (TR at 17).

26 Officer Harris also testified that she observed "what appeared to be large bundles of
27 backpacks in the rear of the vehicle." (TR at 38). Officer Harris agreed on cross-
28 examination that while she testified that she turned her brights on to get a better view of the

1    back of Defendants' vehicle, this was not a fact that she put in her report, nor was it a fact
2    she included in her grand jury testimony. (TR at 43). Officer Harris stated that the bundles
3    "appeared to be large square backpacks, which they normally are." (TR at 39). Officer
4    Harris also stated the bundles were in plain view and that they covered the back window
5    except for the top part of it. (TR at 39-40).

6       The Court's first concern with the testimony about the marijuana backpacks is the
7    vivid detail Officer Yazzie provided during the hearing. Officer Yazzie testified that she saw
8    two two-foot square backpacks and that she viewed the detail of the imprint of the burlap,
9    which was small brown squares, pressed up against the back window. It is difficult to find
10   it credible that Officer Yazzie allegedly saw and remembered the detail of the burlap
11   including the imprint of small brown squares but she failed to include any of these details in
12   her report. In her report, Officer Yazzie described her observation, the critical reason for
13   initiating the stop, as viewing large burlap backpacks stacked against the rear window of the
14   van.

15      The testimony of Officers Harris and Yazzie was contradicted by the testimony of the
16   defense's expert witness as to the ability of anyone to see through the dark tint on
17   Defendants' rear window. Mr. Bright used a "tint meter" to assess the darkness of the tint
18   and its affect on one's ability to see through the window. A tint meter is a certified
19   instrument that Mr. Bright calibrates before every use. (TR at 75-76). Mr. Bright calibrates
20   the tint meter and then tests it against two factory-made samples of glass. (TR at 75-76).
21   The tint meter tests the percent of light that can be transmitted through the tint. As an
22   example, a reading of 77 means the tint is relatively light as it is permitting 77% of light to
23   pass through the tint. (TR at 76).

24      Mr. Bright testified that he went out to the impound lot and used the tint meter to test
25   the tint on the rear window of Defendants' vehicle. (TR at 77). The test revealed the tint on
26   the vehicle allows only ten percent light through the tint. (TR at 77, *see also* Exhibit 13).
27   Mr. Bright testified that the lower the number on the tint meter, the lower the amount of light
28   that can penetrate through a window. (TR at 78). As an example, Mr. Bright offered that

1  Arizona law only permits the driver's side and passenger side windows to have tint that is
2  33 percent plus or minus three. (TR at 78). As another example, a limo tint is typically zero
3  to five percent. (TR at 78). Arizona law does not regulate the tint of other side windows or
4  rear windows. (TR at 90).

5  In addition to testing the tint, Mr. Bright also took a photograph at the back of the
6  vehicle that shows the reflective nature of the tint. (TR 79-80, Exhibit 15). The photograph
7  shows the reflection of Mr. Bright, the photographer, as he takes the photograph. (Exhibit
8  15). Mr. Bright also offered testimony on a photograph taken by law enforcement after
9  Defendants' vehicle was impounded. The photograph is taken at night with a bright light that
10 appears to be shining through the center of the front windshield. (Exhibit 6). The
11 photograph appears to be taken to show how the marijuana would have appeared to the
12 officers from behind Defendants' vehicle. (TR at 80). Mr. Bright testified that the only thing
13 that could be seen in the Defendants' vehicle with the light directly in the center or
14 approximately in the center of the windshield is an outline of something. (TR at 80, Exhibit
15 6). Mr. Bright testified that given the dark tint with a ten percent rating and a light shining
16 directly through the front windshield into the interior of Defendants' vehicle, this photograph
17 depicts what he would expect to see through the dark tint, which is the outline of something
18 in the back. (TR at 81).

19 Based on his experience of using tint meters for the past ten to 15 years, Mr. Bright
20 testified that headlights from oncoming traffic would not be able to illuminate the interior of
21 Defendants' vehicle such that a person could actually discern that burlap sacks were in the
22 back of the vehicle through the dark tint. (TR at 82-83). Mr. Bright testified that his opinion
23 would be the same for headlights from a vehicle following behind Defendants' vehicle and
24 shining light on the dark tint of the rear window. (TR at 82). Specific to the light of
25 oncoming traffic, Mr. Bright testified that headlights are designed to shine some light into
26 the oncoming lane but that most of the light is directed to the center of the roadway and to
27 the right so as to avoid blinding drivers. (TR at 83). On cross-examination, Mr. Bright
28 agreed that he had not tested Defendants' vehicle at night to see how the light actually looked

1  from the front or back as he did not have access to the vehicle. (TR at 87-88). He did,
2  however, feel confident giving his opinion that only an outline of what was in the vehicle
3  could be seen because of the ten percent tint and his experience and training with how
4  vehicles will or will not be illuminate with light. (TR at 91).

5  On re-direct, Mr. Bright again testified that it would be impossible to tell if the outline
6  in the vehicle was a burlap sack, if the officers could see the outline at all. (TR at 92). Mr.
7  Bright was also not convinced that the officers had light as bright as the light in the
8  photograph when they were driving and Defendants' vehicle was lit only from oncoming
9  traffic headlights and the officers' vehicle headlights. (TR at 92, Exhibit 6). Even with the
10 bright, intense light shining through the center of the front windshield in the photograph, Mr.
11 Bright pointed out that he could only see an outline of what is in the back of the van. (TR
12 at 92). He noted he could not see the burlap, the cloth seats, a jacket or anything else - only
13 the outline. (TR at 92).

14 Mr. Bright's testimony was compelling. The tint on Defendants' vehicle looks dark
15 in the photographs submitted as exhibits and as tested by Mr. Bright, it admits only ten
16 percent light. The photograph taken by law enforcement with the marijuana bundles in the
17 vehicle and a bright light shining through the windshield further corroborates Mr. Bright's
18 testimony. (Exhibit 6). At best, only a rough outline of something in the vehicle can be seen.
19 Frankly, if someone did not know that the outline was bundles of marijuana in the back of
20 the vehicle, it is difficult to even discern whether the outline is of something in the back of
21 the vehicle or whether it is an outline of the seats. (Exhibit 6). Further corroborating Mr.
22 Bright's testimony is the fact that neither officer in her incident report describes in detail
23 what they could see in the back of Defendants' vehicle and neither mentions the use of the
24 brights. Based on the testimony, the Court finds the officers, at best, could see an outline of
25 something in the back of Defendants' vehicle.

26 The officers also described the vehicle as traveling slowly and "heavily laden." (TR
27 at 13, 39). When asked to explain what she meant by heavily laden, Officer Harris said "[i]t
28 appeared to be heavier. It was – that there might be something in the back of it, either illegal

- 10 -

1  aliens or contraband." (TR at 39). Officer Harris agreed on cross-examination that she did
2  not testify to the grand jury that the vehicle appeared heavily laden. (TR at 44-45). Officer
3  Harris testified that she did not take a measuring tape and measure the distance from the
4  ground to the vehicle to compare any difference between when the marijuana was in the
5  vehicle and when it was not in the vehicle. (TR at 49).

6  The Government offered two photographs as proof of the heavily laden vehicle. One
7  photograph was taken with the marijuana in the vehicle, the other without it. (Exhibits 5,
8  18). Officer Harris testified as to the two photographs taken of Defendants' vehicle once it
9  was impounded by ICE. The first photograph, Exhibit 5, is taken with the marijuana bundles
10 still in the vehicle and the tailgate closed. (TR at 42; Exhibit 5). The second photograph,
11 Exhibit 18, is taken with the marijuana out of the vehicle and the tailgate open. (TR at 42,
12 Exhibit 18). Neither photograph is taken with people in the vehicle.

13 The photographs are taken at different angles and appear to be taken at different
14 heights. Exhibit 18 is a photograph taken closer to the vehicle. Officer Harris testified that
15 a white line under the parked vehicle could be more easily seen in the photograph of the
16 vehicle without the marijuana. She testified that she could see a difference around the
17 muffler of the vehicle when the marijuana was in the vehicle compared to when the
18 marijuana was taken out of the vehicle. (TR at 42). She states after the marijuana is taken
19 out, "[y]ou can see the white line more down by the muffler–" (TR at 42).

20 The defense's expert analyzed the weight of the vehicle and presented detailed
21 testimony supporting his ultimate opinion that Defendants' vehicle could not have appeared
22 heavily laden. (TR at 67). To assess this factor, Mr. Bright began by obtaining the exact
23 equipment of this particular Dodge Caravan through its VIN number. (TR at 58-60). The
24 VIN number also gives the "gross axle weight ratio for the rear axle" and the "overall gross
25 vehicle rating." (TR at 58). Based on the equipment on Defendants' particular Dodge
26 Caravan, Mr. Bright determined the vehicle's "curb weight", its weight when the vehicle is
27 parked at the curb and ready to drive, was 3,411.8 pounds. (TR at 61-63). The maximum
28 "gross weight" of Defendants' vehicle, the total load that the vehicle can carry without

1  exceeding the standards and the total load that can be applied to the front axle and the rear
2  axle, was 5, 040 pounds. (TR at 61, 64). Thus, gross weight includes the curb weight and
3  any cargo, passengers, etc. that a vehicle is carrying. (TR at 63). The gross weight on the
4  rear or front axle cannot exceed 2,544 pounds. (TR at 64). If gross weight on a vehicle is
5  exceeded, Mr. Bright testified that a person could make observations as to how low that
6  vehicle would ride. (TR at 63).

7  Mr. Bright testified that the critical weight to determine if the rear of the vehicle
8  appeared heavily laden would be the weight on the rear axle as Defendants' vehicle was
9  carrying three passengers toward the back of the vehicle and the marijuana backpacks were
10 in the back of the vehicle. (TR at 65). Thus, Mr. Bright calculated whether the weights of
11 the three persons, as over-estimated at 300 pounds each, with the weight of the marijuana
12 backpacks as stated in the Indictment, exceeded the gross vehicle weight limits for the rear
13 axle. (TR at 65-66). Mr. Bright estimated three individuals at 300 pounds each for a total
14 of 900 pounds and marijuana, 175 kilograms converted to 324 or 325 pounds dependent on
15 how far the decimal is carried. (TR at 66). Knowing that the gross weight for the entire
16 vehicle is 5440 pounds and the total curb weight is 1628 pounds, the rear axle could have
17 carried 1181 pounds without exceeding its maximum. (TR at 66). Thus, the 1200 pounds
18 of over-estimated passenger weight and the marijuana weight is just above the gross weight
19 for the rear axle. (TR at 66).

20 Mr. Bright concluded that the vehicle would not have been heavily laden on the night
21 the officers initiated the stop. (TR at 67). Mr. Bright also offered examples of how the
22 Government could have shown evidence of a heavily laden vehicle. (TR at 67-68).

23 Mr. Bright also testified as to the lack of reliability of the Government's offered
24 photographs. Mr. Bright noted the photographs, Exhibits 5 and 18, are each taken from a
25 different location and a different angle. (TR at 68-69). Mr. Bright noted the second
26 photograph, Exhibit 18, appeared to be taken at a much closer angle or with a zoom lens as
27 the background is not visible. (TR at 70). Mr. Bright opined that if someone wanted to
28 determine whether there was any "sag in the rear based on the load of –or the weight of the

1  vehicle" the camera used to take the photographs should have been set on a tripod and kept
2  at a consistent spot while a photograph was taken with the marijuana in the vehicle and one
3  without the marijuana. (TR at 69). Mr. Bright also suggested a tape measure or some
4  measuring instrument should have been used in the photographs to measure the distance
5  between the bumper of the vehicle and the ground so the photographs could show any
6  difference of the vehicle being weighed down by the marijuana or lightened up without it.
7  (TR at 69). Mr. Bright testified that using a consistent camera angle and height with a
8  numeric measurement would be the way to scientifically show the effect of the marijuana
9  weight in the vehicle. (TR at 69). Mr. Bright also testified that Exhibit 3 appeared to be a
10 photograph taken with the marijuana in the vehicle and it was another example of how the
11 vehicle did not appear heavily laden. (TR at 70, Exhibit 3). Mr. Bright could not conduct
12 his own test of whether the vehicle was heavily laden because when he inspected the vehicle
13 its right rear tire was flat. (TR at 71). The tire did not appear flat on the night of the stop nor
14 did the officers mention a flat tire. (TR at 71).

15 The Court is not convinced by the testimony that the vehicle appeared heavily laden.
16 The photographs used by the Government to support this fact are not reliable. From the start,
17 the photographs are not accurate because there are no people inside the vehicle. Also, it
18 appears more of the white line under the vehicle is visible in the Exhibit 18 photograph
19 because the photograph is taken at a closer and lower angle to the vehicle. There is no
20 scientific measurement offered to show that the vehicle appeared heavily laden in the
21 photographs and just by looking at them, it does not appear heavily laden. Further, defense's
22 expert witness presented credible testimony that this particular Dodge Caravan carrying the
23 weight of the marijuana and three large individuals on the rear axle would not have caused
24 the vehicle to sag or appear heavily laden.

25 Officer Harris also testified that there had been a light rain that night. (TR at 38). She
26 later stated that based on her knowledge, Border Patrol checkpoints usually do not operate
27 during rain and that drug traffickers will take the opportunity when checkpoints are down to
28 move their contraband. (TR at 40). Officer Harris did not put anything about rain in her

1  report and she did not testify about rain being a factor for initiating the stop when she
2  testified before the grand jury. (TR at 45). The Court gives this factor little weight. If the
3  light rain was a meaningful reason for being suspicious of Defendants' vehicle, one of the
4  officers would have put that fact in her report and/or Officer Harris would have testified
5  about that fact during the grand jury hearing.

6  As the officers were following Defendants' vehicle, Officer Harris ran the vehicle's
7  license plate. She determined that the vehicle was registered to a Heather Griffiths in
8  Glendale, Arizona - just outside of Phoenix. (TR at 11-12, 38). Officer Yazzie testified that
9  the vehicle registration location raised her suspions because it was an out-of-area
10 registration and the vehicle was traveling through the Tohono O'odham reservation in the
11 middle of the night. (TR at 12). Officer Harris also testified that the Glendale registration
12 raised her suspicions but agreed on cross-examination that it was not a factor she included
13 in her report. (TR at 40, ). On cross-examination, Officer Yazzie also agreed that it was
14 common for vehicles to use State Route 86 and that it was not unusual to see a number of
15 vehicles on that road. (TR at 29-30).

16 After their observations, Officer Harris turned on her red and blue emergency lights
17 to initiate a stop of the vehicle. (TR at 13). Both officers testified that the vehicle was still
18 moving when three individuals jumped out of it. Officer Yazzie stated the vehicle "did slow
19 down and attempted to move off the – off to the shoulder or dirt." (TR at 14). The Officers
20 both testified that while the vehicle was slowly moving, three individuals jumped out of the
21 vehicle and ran into the desert. (TR at 14, 41). Officer Yazzie described the timing of the
22 individuals jumping out of the vehicle as "the vehicle was still rolling quite slowly . . ." (TR
23 at 14). Officer Yazzie agreed on cross-examination that she did not include in her report that
24 Defendants' vehicle was still rolling when the three individuals fled from it. (TR at 28).
25 Officer Harris testified that the vehicle came to a gradual stop and that the three individuals
26 exited the vehicle was it was still moving "at a slow, very slow rate." (TR at 41).

27 After the three individuals fled from Defendants' vehicle, Officer Yazzie jumped out
28 of her vehicle and attempted to chase them but the individuals had already jumped a fence

1  and fled into the desert.  (TR at 14).  The officers then conducted their stop of Defendants'
2  vehicle and discovered the marijuana bundles.

3  **Standard for Review**

4  The Fourth Amendment prohibits an officer from stopping a vehicle without a
5  reasonable or founded suspicion of criminal conduct at the time of the stop.  *United States*
6  *v. Rodriguez*, 976 F.2d 592, 594 (9th Cir.1992).  Reasonable suspicion exists when an officer
7  is aware of specific, articulable facts, which together with objective and reasonable
8  inferences, form a basis for suspecting that the particular person to be detained has
9  committed or is about to commit a crime.  *United States v. Salinas*, 940 F.2d 393, 394 (9th
10 Cir.1991).  The determination whether reasonable suspicion exists must be based on "the
11 totality of the circumstances - the whole picture." *United States v. Cortez*, 449 U.S. 411, 417
12 (1981).  The facts are to be interpreted in light of a trained officer's experience, and the
13 whole picture must be taken into account.  *United States v. Sokolow*, 490 U.S. 1, 8 (1989).

14 In a motion to suppress the Government has the burden of production to put forward
15 the "specific and articulable facts."  *United States v. Willis*, 431 F.3d 709, 715 n. 5 (9th
16 Cir.2005) (quotations omitted).  The defendant has the burden of proof on the motion to
17 suppress.  *Id*.

18 Resolving this Motion is a question of credibility on the alleged facts supporting
19 reasonable suspicion.  As the Ninth Circuit instructs jurors, this Court considers the
20 following when determining who is credible on a given fact: the witness's opportunity and
21 ability to see or hear or know the things testified to; the witness's memory; the witness's
22 manner while testifying; the witness's interest in the outcome of the case, if any; the
23 witness's bias or prejudice, if any; whether other evidence contradicted the witness's
24 testimony; the reasonableness of the witness's testimony in light of all the evidence; and any
25 other factors that bear on believability. FedCrim-JI9C 1.7 Credibility of Witnesses. In this
26 case, the officers' testimony on their ability to view the marijuana backpacks through the rear
27 window of Defendants' vehicle and their testimony that the vehicle appeared heavily laden
28 is directly contradicted by Defendants' expert witness. Many of the other factors relied upon

1  by the Government are not corroborated by their reports or supported by the other available
2  evidence.

3  The Government relies on a number of facts to support reasonable suspicion. First,
4  State Route 86 in the area around Pisinemo Village and Sells is a known drug smuggling
5  route. Officer Yazzie provided credible testimony on this fact.

6  Second, the officers testify that they saw what appeared to be burlap square backpacks
7  of marijuana. Officer Yazzie testified in great detail about being able to see the square
8  imprint of the burlap. The Court is not convinced that the officers saw anything more than
9  an outline of something in the back of Defendants' vehicle. Officer Yazzie's testimony at
10 the evidentiary hearing about the detail of the burlap sacks is disconcerting to this Court
11 given its lack of corroboration in her police report - in her police report, Officer Yazzie stated
12 only that she saw large burlap backpacks stacked against the rear window of the van.

13 As the officers testified, it was a dark night with no surrounding light. The only light
14 available was from the officers' vehicle and oncoming traffic. Compelling to the Court are
15 the two photographs listed as Exhibit 6 and Exhibit 15. In a photograph set up by a law
16 enforcement agent with a bright light shining directly through the center of the front
17 windshield, little can be seen from the rear of the vehicle. (*See* Exhibit 6). At most, a person
18 could distinguish a fuzzy outline. Officer Yazzie testified in detail about how she could see
19 the square outline of the backpacks and the square outline was two separate two-foot square
20 objects. Officer Harris also testified that as she looked through the rear window of
21 Defendants' vehicle she also saw large square bundles. There is nothing square or
22 rectangular in the photograph; there are no hard or sharp lines. (*See* Exhibit 6). Further, both
23 officers testified that they could see the brown burlap. Again, the only thing that can be seen
24 in the photograph are two black fuzzy lines.

25 Further, Exhibit 15 shows the reflective nature of the rear window and the Court is not
26 inclined to believe with a dark tint that allows only ten percent light penetration and an expert
27 testifying that headlights from the rear could not illuminate the detail to see burlap sacks that
28 the officers saw anything more than the fuzzy outline of something in the back of the vehicle.

1  The Court also points out that the Government had an opportunity to show a photograph of
2  what the back of Defendants' vehicle looked like with light illuminating from the rear but
3  no photograph with that evidence was presented.

4  The trier of fact must consider, as part of determining credibility, whether a witness's
5  testimony is contradicted by other witnesses and if the witness's testimony is reasonable in
6  light of all the evidence. *See* FedCrim-JI9C 1.7 Credibility of Witnesses. The officers
7  testimony that they observed square-shaped bundles that appeared to be marijuana is
8  contradicted by defense's expert witness and it is unreasonable in light of the other evidence
9  presented, as exemplified by the photograph, Exhibit 6.

10  The Court is also not convinced that the vehicle appeared heavily laden. Again, Mr.
11  Bright's testimony is compelling on this point. The maximum gross weight for the rear axle
12  of the vehicle was exceeded by just nineteen pounds assuming that all three of the passengers
13  in the back weighed 300 pounds each. It is extremely unlikely those passengers weighed 300
14  pounds each as they were described as jumping out of the vehicle, jumping over a fence and
15  fleeing into the desert before Officer Yazzie could pursue them. Thus, the science does not
16  support a theory that the vehicle was heavily laden. Further, the photographs with the
17  marijuana in the vehicle do not show a vehicle that is sagging in the back or weighed down
18  from the marijuana.

19  The Government argued that Exhibit 5 and Exhibit 18 show that a white line under
20  the vehicle in the impound lot is much more visible when the marijuana is out of the van.
21  The Court does not accept these photographs as reliable evidence. As testified to by Mr.
22  Bright, the photographs are clearly taken at different angles and different distances to the
23  vehicle. Those changes affected what could or could not be seen under the vehicle. Also,
24  the photograph did not include any people in the vehicle. Likewise, the Government had the
25  opportunity to take photographs on a tripod with consistent distance and angle and with a
26  measuring tape on the vehicle to show that the vehicle was closer to the ground with
27  marijuana in it. It did not take those photographs. Further, Exhibit 3 is another photograph
28  of the vehicle with the marijuana in it, which has a clear view of the driver's side rear tire

well.  (*See* Exhibit 3).  Nothing in the photograph suggests the vehicle is weighed down by the marijuana; in fact, the vehicle seems to be sitting well above the tire.

The officers also testified that the out-of-are vehicle registration raised their suspicion. The registration was listed for Glendale, Arizona - a suburb of Phoenix.  The fact that someone from the Phoenix area would be driving along what was, according to the testimony of the agents, a busy State Route 86 at 12:30 a.m. at night may be somewhat suspicious but not sufficient by itself.

There were other factors to which the Court gave little weight.  Officer Harris's testimony that there had been a light rain and that drug trafficking increases after a rain because Border Patrol closes its checkpoints was of little value.  There is no corroboration that the officers actually relied on this fact to make the stop.  If the officers had relied on that fact, it should have been in one of their reports.  Likewise, the officers both testified that Defendants' vehicle was traveling at a slow speed.  Their reports do not corroborate that this was a critical factor for initiating a stop.  Further even if Defendants were traveling 10 to 15 miles below the speed limit on a busy two lane highway in the middle of a dark night, the Court is not convinced that this carries much suspicion.  Finally, the fact that both officers testified to following Defendants for four miles between milepost 106 and milepost 102 is also of little consequence.  As the officers testified, traffic was heavy that night and the officers were traveling back to their office. They approached Defendants' vehicle and waited for a break in oncoming traffic to pass.  Instead of passing the vehicle, they then followed Defendants for a while and then initiated a stop.  All of this while traveling above 50 miles per hour.  It seems likely they would have traveled four miles.  There was no testimony that the way Defendants' vehicle drove during this distance was suspicious or that the distance driven was suspicious.

The final factor relied upon by the Government is the exit of the three individuals from Defendants' vehicle while it was alleging still moving "very slowly".  This is not a factor that should be considered in ascertaining reasonable suspicion under the facts of this case.

- 18 -

1    Reasonable suspicion necessary for the stop of a vehicle can be based on events that
2 occur during a chase by border patrol officers once an officer has initiated a stop of the
3 vehicle. *United States v. Santamaria-Hernandez*, 968 F.2d 980 (9th Cir.1992). In
4 *Santamaria*, after the Border Patrol officer initiated the stop, the driver of defendants' vehicle
5 accelerated from 50-55 mph up to 70-80 mph and three heads of people hiding in the vehicle
6 popped up in the back seat of the vehicle. *Id*., 968 F.2d at 982. The District Court in that
7 case found reasonable suspicion lacking because such suspicion was not developed prior to
8 the officer initiating a stop of the vehicle. The Ninth Circuit reversed the District Court,
9 holding that reasonable suspicion could be developed until an actual seizure of the vehicle
10 occurred, which would not happen until the vehicle yielded to the officer initiating the stop.
11 *Id*. Thus, the actions of the driver in accelerating and failing to yield to the officer initiating
12 the stop gave the officer sufficient reasonable suspicion to stop the vehicle. *Id*. at 982-983.
13    The Ninth Circuit based its decision on the Supreme Court's reasoning in *California*
14 *v. Hodari D.*, 499 U.S. 621 (1991). In *Hodari*, the defendant who was fleeing from law
15 enforcement when he tossed away a rock of cocaine was not "seized" in terms of the Fourth
16 Amendment until law enforcement tackled and handcuffed him. Thus, the rock cocaine that
17 defendant tossed away when he was fleeing from law enforcement was not suppressed
18 because defendant had not yet been seized and the Fourth Amendment did not apply. *Id*. at
19 626. The Supreme Court ruled that a seizure does not occur if, in response to a show of
20 authority, the subject does not yield; in that event, the seizure occurs only when the police
21 physically subdue the subject. *Id*.
22    In *Santamaria*, the Ninth Circuit analogized a defendant fleeing on foot to a defendant
23 fleeing in his car. A defendant fleeing in his vehicle is the same as a defendant fleeing on
24 foot and is therefore not "seized" for Fourth Amendment purposes until he is physically
25 apprehended by law enforcement at the end of a chase. "The determination whether officers
26 have founded suspicion to justify a stop may take into account all of the events that occur up
27 to the time of physical apprehension of a suspect who flees." *Santamaria*, 968 F.2d at 983.
28    The case before this Court is distinguishable from *Santamaria*. Defendants did yield

- 19 -

1  in response to a show of authority from the officers. Both officers testified that when Officer
2  Harris initiated her red and blue emergency lights, Defendants slowed their vehicle and
3  began moving it to the side of the road. The fact that three of the passengers in Defendants'
4  vehicle fled is not of consequence to whether these two Defendants, and in particular the
5  driver of the vehicle, yielded. All evidence shows Defendants yielded by immediately
6  slowing their vehicle and stopping within a reasonable amount of time.

7  Thus, the Government is left with little in the way of reasonable suspicion to stop
8  Defendants' vehicle. At best, the officers observed a fuzzy outline of something in the back
9  of Defendants' vehicle while Defendants were driving on a road known for drug smuggling
10 in a vehicle registered to someone in Phoenix. Defendants have met their burden of showing
11 the officers did not have the requisite reasonable suspicion to stop their vehicle..

**Recommendation**

13  For the reasons outlined above, the Magistrate Judge recommends that the District
14 Judge after her independent review, GRANT the Motion to Suppress. (Doc. 26).

15  Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file
16 written objections within fourteen days of being served with a copy of the Report and
17 Recommendation. If objections are not timely filed, they may be deemed waived. The
18 parties are advised that any objections filed are to be identified with the following case
19 number: **CR-10-463-TUC-CKJ**.

20  DATED this 23rd day of November, 2010.

_____
CHARLES R. PYLE
UNITED STATES MAGISTRATE JUDGE

- 20 -